Mr. Boyd. Good afternoon, Your Honors. Andy Boyd from the State Appellate Defender's Office on behalf of Jose Sanchez. If it please the Court and Counsel. The question this case presents is a simple one, Your Honors. Did the drug interdiction activities of Trooper Thulin prolong the traffic stop here beyond the length of time it would reasonably have taken Thulin to complete the lawful mission of the traffic stop? If the answer to this question I respectfully submit is yes. How many minutes after he stopped him did the dog alert? I believe it was seven and a half, that's my recollection. You see the cases out there where seven and a half minutes was held too long? I have seen numerous cases on this issue, Your Honor, and there's no stopwatch rule that I'm aware of. I'm sorry. There's no stopwatch rule that I'm aware of, Your Honor. In other words, the count, the minute and seconds count is beside the point here. It's what Trooper Thulin did and did not do. What is it that he didn't do? Yeah, that makes it reversible. The primary problem, as the trial court found, was that he wasn't riding the speeding ticket. The primary mission of this stop under Rodriguez was to investigate the traffic violation, if there was one, and issue a speeding ticket if that was warranted. Trooper Thulin wasn't doing that. And primarily, he wasn't, as the trial court found, this was a factual determination that the trial court made, was that he wasn't riding the speeding ticket at any point during this traffic stop. He wasn't pursuing the lawful contours of this mission, which was to investigate and... I don't have the specific facts on Rodriguez committed in memory. My recollection, though, is that the traffic stop had been completed, and at that point, the trooper then proceeded with the drug investigation. Yes. It's a slightly different factual scenario here, but the principle of law, the operative principle of law here is the same in Rodriguez as it is in this case. Did the officer's drug interdiction activities prolong the mission of the traffic stop? And it did. What was the mission of this, because that term was thrown around, the mission of the officer? What was that found to be? The lawful mission of the officer or the actual mission of the officer? These are two different things, Your Honor. Well, let's just go with the mission of the officer. The officer, Trooper Thulin, stopped Jose for speeding. Right, we know the facts. And so the mission... So was it speeding? Under Rodriguez, then, the mission of the traffic stop was to investigate the speeding violation and to issue Jose a ticket if that was warranted. Is there a requirement that it be done within a certain period of time? There's no stopwatch rule? Again, there is no stopwatch rule, so no, there's no requirement that it be done within a certain amount of minutes or seconds. But the drug interdiction activities that Trooper Thulin admitted that he was doing cannot prolong the stop. Based on a hunch or just some... I don't have the slightest idea what caused Trooper Thulin to believe that illegal activity was taking place. I couldn't say. Okay, so since you don't know, but you're assuming it was drug interdiction activity he was doing, right? I'm not assuming... Is that only an assumption because he hadn't started writing the warning within so many minutes or at all? All respect, Your Honor, it's not an assumption. Trooper Thulin testified to that. He testified that one of the reasons he stopped was drug interdiction. Okay, so we have an admission of drug interdiction. Is that wrong? Is that a problem? It's a problem if it prolongs the traffic stop beyond the amount of time it would reasonably take to complete the admission of the traffic stop. So could he reasonably write a speeding ticket in seven and a half minutes? He'd get the stop, he'd get the driving license, come back and write a ticket and have the fellow on his way in seven and a half minutes? Every one of these cases has a different set of facts. Every one of these cases has a different factual scenario. Every one of these cases presents a different situation for the trooper. Well, let's talk about another fact in this case. This was a rented car, wasn't it? Yes. And is the trooper allowed to check to see the fact that the person whose name is on the rental papers isn't even in the car? So is this car stolen? Under the casino case, which I cited in my reply brief, the trooper is not allowed to insert himself into a contractual relationship between whoever it was that rented the vehicle and the car rental company. It's not Trooper Thulin's job to police that. Unless he has some sort of independent probable cause to believe that the vehicle has been stolen or something like that, Trooper Thulin doesn't. It's not his job at that point to insert himself into that contractual relationship. Okay, so what you're saying then is the activity... I'm just concerned about how you define the activity of writing this warning ticket. So we have a lawful traffic stop. We don't argue about that, do we? Yes, correct. Okay, so what is this activity that he is supposed to do for that stop, which we said was the stated mission by the officer, I believe, right? Primarily it's writing the ticket. Under Rodriguez and the related cases, the officer... So writing the ticket doesn't necessarily mean pen to pen. You have to do some preliminaries before you write the ticket. Right. There's the phrase attending activities, something along those lines. And the Rodriguez court has talked about checking for warrants, things of that nature. The officer is allowed to do that. Check and give away the driver's license. The officer is allowed to do that. But the primary purpose of this is to investigate the traffic violation and it's warranted to write a ticket. Okay, so we have in the record that there was a speeding violation, writing a warrant, correct? But he can do these other ancillary activities. According to the trial court's determination, Your Honor, he wasn't writing the ticket at the scene. According to the trial court's ruling, he most probably wrote the entirety of this ticket at the Geneseo Police Department, not at the scene of the stop. Okay. So that's writing the ticket. But are there preliminary activities that were testified to as a matter of record before the drafting, wherever the drafting may have occurred? To the best of my knowledge, what the record shows is that Trooper Thulin wasn't doing those things either. He didn't do his radio call into dispatch until after Trooper Fatski had arrived with the drug-seeking dog. Now, I understand that the State and I do have a dispute about whether or not he was doing a computer check on Jose Sanchez. But my understanding of the record, and it's been a while since I've seen this video, I'll have to admit to that, but my understanding of the record is that he wasn't doing any of these checks until Trooper Fatski arrived. What he was doing was asking Jose Sanchez a series of drug interdiction-type questions. Where are you going? Who is the renter of this car? What are you going to do when you get there? Who's the passenger? These types of questions. And Trooper Thulin, he didn't need to know any of that information in order to issue a warning ticket. None of that information was relevant. You're going back to that old Gonzales thing that the Illinois Supreme Court's already shot down about the scope of the stop, that he can't ask him about anything other than speed. And the Illinois Supreme Court buried that thing a number of years ago. He can't ask those questions unless it prolongs the stop unreasonably. And that's what happened here. Trooper Thulin is not a novice at this. The man knew exactly what he was doing. He was asking those questions because he was stalling at the scene so Fatski could get there with that dog and perform the snip. I don't know how to put it any more plainly than that. Of course he was stalling for time. The idea that this is a different inquiry than the one related to the traffic stop and these cases have said that that's not relevant, okay. It's the prolonging of the stop. And that's what Trooper Thulin, let's just talk plainly here. Trooper Thulin was stalling at the scene until Fatski got there so he could perform a drug sniff. That's what he was doing. Take it a little slower. I'm having a hard time hearing you. Sure. Trooper Thulin was stalling at the scene until Fatski got there with the drug dog. It's as clear as it can be from the record, and I don't know how to say it any more plainly, that's what he was doing. He was performing drug interdiction tasks to prolong the stop until Fatski got there. Well, if in fact, if that dog hit on that car in seven or seven and a half minutes, the traffic stop, he didn't prolong, the drugs were found before the stop was prolonged because traffic stops take longer than seven and a half minutes. They do when you're performing drug interdiction at the same time, yes. Well, they do, I think they do on a routine stop. If you're writing a ticket, you're doing a background check, and you do warrant checks and stuff, something like that, who's the owner of the car, you can't get a minute out of there in seven and a half minutes. And so, with all respect, I've seen that ticket. That ticket should have taken an experienced Illinois State Trooper about 35 seconds to fill out. Did Mr. Rodriguez say the stop has to be unreasonably prolonged? It did say unreasonably prolonged, but there's also, there's no de minimis exception. You can't just prolong it for a little bit. Anything prolonged, what unreasonable, if I understand it, is what unreasonable means. When has the Supreme Court ever said that, that you can't prolong it for a little bit? They said you can't unreasonably prolong it. And in Rodriguez, it was unreasonably prolonged. It was, you didn't need Rodriguez's case under those facts to know that that was going nowhere, because the police certainly did unreasonably behave in that situation. As I recall, the fellow asked, he did the, wrote the ticket and all that stuff, and then he said, oh, by the way, can I search your car? No, thanks. Well, then get up, stand over there, and then wait quite some time for a drug sniffing dog to show up. Well, if we knew that was a loser, who would have read the facts? But the Supreme Court pointed to a case where it said you can't prolong it for a little bit. My understanding is that's what unreasonably means. If you've gone past that point in time where it would take a reasonable officer to complete these tasks, then it becomes an unreasonable prolongation of that time. So what is your basis for saying that a reasonable officer could have completed this stop within seven and a half minutes? Part of it here is because he wasn't doing those tasks that he was supposed to be doing, that were fundamentally focused on the mission of the stop. He wasn't doing those things. My understanding of the record is that he wasn't performing these computer checks. He hadn't radioed in to dispatch. He wasn't writing the ticket. And if he wasn't doing any of those things, then what in the world was he doing? He certainly wasn't doing anything that had anything to do with investigating the traffic incident or writing Jose a ticket. The things that he was doing was prolonging the stop, And I would gently urge this Court to move away from this idea that it's okay because it was only seven and a half minutes. But what about the recent case in the Second District, Hurch? Hurch is how we pronounce it. Right. The first thing I point out is that this Court's decision in pulling this is directly at odds with that. I'm sorry. Once again, let's talk a little slower because it's... This Court's decision in people being pulled is directly at odds with that case. And what I would also respectfully point out is that the question is not what could a theoretical officer have done in a theoretical period of time. The question is what did this officer do in this particular set of circumstances. And that's 100 percent or 180 degrees from correct because we always use a reasonable officer standard, don't we? We do, but we use it in relation to what the actual officer did in the actual situation. If we agree with you, would we not be the first Court in the free world to say that a seven and a half minute stop for speeding was unreasonably prolonged? I don't know, but again, I would gently urge Your Honor to get off of the seven and a half minutes. With all respect, there's no stopwatch rule here. Yes, and I will concede. This was a relatively brief stop as far as these things tend to go. I will... But you want to focus on the activities that are required for that to be as defined. Absolutely. In this particular situation, what did Trooper Thulin do? What did Trooper Thulin not do? Okay, let's talk about polling. A nice way to argue it is tell us what we did in polling. That's in opposition to the Second District. My recollection is that this Court focused on that, what the officer did and what the officer didn't do, as opposed to HRSA's where we have what a hypothetical officer could have done in a hypothetical situation. So that's really the points of law that are at issue now, right? I think that's part of it. I think more fundamentally what's at issue is the very simple holding in Rodriguez. And the question is, do we take Rodriguez seriously or not? What was the holding in Rodriguez? The holding of Rodriguez. Sure, sure. A traffic stop prolonged beyond the point where the officer should reasonably have been expected to complete the stop. The stop's mission is unreasonable and unlawful under the Fourth Amendment. That is the fundamental operative principle of law here. Absolutely. And to get to where you want to go, don't you have to say that this officer could have reasonably completed this stop within seven and a half minutes? No. All we have to do is focus on what the officer did, what Trooper Thulin did and what he didn't do, and put the stopwatch in our pocket. Which is what hurts, where you're at issue with hurts. Yes. Okay. Let me answer this. So the Trooper says he knows, he gets a guy, not a new, five over, ten over, but the fact is he knows from a tip or infrequently this guy, this person's hauling dope. So he not only wouldn't have stopped that car, but for the fact that he knows it's a person carrying dope. Sure. But nonetheless, he's got it for speeding. And so is that okay to stop that car? Because it's a three-time stop. And that is one of the cases the State cited. I refer to that in my reply brief. The State has also obviously referred to that in their brief. It's having a hard time pronouncing this. The Fascinac case is a four-district case. The Fascinac case are similar to the ones you articulated. In that case, what the court found, what the fourth district court found, was that there was an independent, reasonable suspicion to search that car before the car was even pulled over. And don't let stopping it. In other words, he gives a guy a stop for going five over the limit. But it's a pretense, really, because he wants to do a drug interjection. And if he has previous reasonable suspicions slash probable cause, that's a totally different case. He's got a tip, which is not run under the laws of reasonable suspicion, but he wants to run a drug dog fight. Hasn't the Supreme Court said, we're not going to whatever this copper was thinking or wasn't thinking, we're not going to open that Pandora's box if he had a basis to stop the vehicle. Even though what he really wanted to do was look for drugs and have a dog sniff that car, hasn't the U.S. Supreme Court said that that's fine? He can stop the vehicle, yes. Whether or not he can perform that dog search and during what time frame he can perform that dog search is a separate question. All right. I think we're all right. Thank you. Mr. Adler. May it please the Court, Your Honors, Counsel. My name is Nicholas Adler and I represent the people of the state of Illinois in this matter. I think, as Your Honors have highlighted, this isn't just a stopwatch set issue. It's a diligence issue and it's a stopwatch issue because the test is the totality of the circumstances and the first thing that we look at is the duration. And as you've all noted here, this duration was exceedingly short by any standard. I'm not aware of any case that says seven minutes or seven and a half minutes is not enough time or is unreasonable enough time. That's easy for the first step. Right. But his argument isn't that. He's saying so be it. So be it. Right. But we've got to look at the individual officer's actions. We do, and that's where the diligence factor comes in. I think, you know, where he's talking about the officer's diligence, it's not measured on some inhumane mechanical efficiency. It's measured in a human's efficiency, a reasonable officer, as Justice Schmidt would say. And so when we have the facts of this case and we look at what the officer was doing, we know this was because he was stopping the defendant from speeding. So writing a written warning was the initial mission. We know based on the Supreme Court precedent. Let me ask this question here. You're stopped for speeding and you're told by the officer you're getting a warning ticket. Where did that happen? At the side of the car? I believe so, yeah. When he was standing at the passenger side. What's the business of having the driver come back and sit in a squad car? What's that business all about? I mean, endangering a citizen along a very busy highway seems to be unreasonable for citizen safety. We hear a lot about officer safety. Let's talk about citizen safety. Isn't that kind of indicative of something more than just a speeding violation? Well, I would say I don't think a citizen is any more in danger for briefly stepping out of the vehicle as opposed to being stopped. I think part of what that goes to, and this was freely testified to, there was absolutely drug interdiction activity happening here. And I believe that. We can't read the trooper's mind. Perhaps he had some alternative reason for bringing him back there. I'm not certain what that is. It wasn't put into evidence why he did it. And the court at the trial level never questioned that fact. And so we don't know what his reason is. Assuming, arguendo, he was doing it for drug interdiction purposes, it didn't unreasonably prolong the stop in the slightest because he still had to go back to his own vehicle and begin running those other mission-related tests. What was continuous dialogue in the squad car with your new buddy? I don't know that I'd call it continuous, but there was certainly a Q&A, a few questions were asked. But the officer testified when he got into the vehicle, he moved the stuff out of the seat. He testified and he took the warning ticket out of the metal box. And that's actually, you don't see him physically doing that in the video, but there was clearly enough time for him to have done that, set the warning box in the back. Then he stated he began looking at the rental agreement, he began looking at the licenses, and he input the information. What about rental agreement? I disagree with the first district opinion that was cited in Casillas. And the reason I do that, it's wholly factually distinguishable from this case. In that case, the officer went up, he found that it was a rental vehicle, and that the defendant's name wasn't on the rental agreement. He didn't ask any follow-up questions. He went straight back to his squad car and spent 25 minutes on customer service with her to figure out what this guy did. And the Casillas court narrowed their holding. They specifically said that this was the inquiry as to whether that act was related to the speeding charge. And it clearly wasn't, and it clearly unreasonably prolonged the stop. In this case, the rental agreement was a quick check because, number one, it's got the insurance information on it. Checking for insurance is required by the officer because Illinois law requires individuals to carry insurance when they're operating a vehicle on the roads of the State. So you can't just set a carte blanche rule that reviewing any rental agreement unreasonably prolongs a stop, which is essentially what the Casillas case is sort of doing, but is what the defendant is advocating for specifically in this case. That doesn't work with how the stop has to be performed. And so the other factor is there's no dispute on whether the officer input the information into the computer the defendant testified to as much in the hearing. He stated that the officer input information into the hearing. He testified the officer never put pen to paper, although that was the only evidence of that. There was nothing else to corroborate that. And ultimately, we didn't argue this heavily in the brief, but I think the trial court's conclusion was against the manifest way to the evidence because we had a written warning that was ultimately issued. The officer testified at both hearings that he did a written warning. He even testified that the sequence of his written warnings were he had written one the day before, he wrote defendants, and then he wrote another one that same day. So it was clear that this wasn't a situation where he just waited until the end of the day when he was filing his paperwork back at the department when he finished that warning. But ultimately, the warning is a red herring in this entire situation because he was performing the mission-related tasks, the license check, the warrant check, and the criminal history check. One of the very first things he did was input that license information into the computer. He said when he has them in his hand, that's when he does it. It's his habit as an officer. In the questioning back and forth with the defendant during the video, he's asking the defendant about his residence or where he lives in Riverside, California. So it's clear very early on he's knocked out the rental agreement, he's input the license information into the computer, and he's waiting. And then a few minutes later, Fratzke shows up. Fratzke goes and does his thing, and the criminal check gets made at somewhere during that point. As far as the written warning is concerned, really that's the last thing that needs to happen before the stop is concluded because if any other preceding event triggers a new situation where he's got a suspended license or he is wanted for arrest somewhere else, that issue is moot. And so even if he hadn't started the written warning, the fact that he already started these other tasks and the fact that no return had come back, it's very important to note when the MVC returned the information, the officer testified it made to Ding. There was no Ding before the dog alerted to the presence of the drugs. I thought I understood opposing counsel to say that none of these activities were taking place until Officer Freaky or Freaky got there. Well, we understand they had to have been because Fratzke got there at least two minutes after he'd already been in the vehicle with the defendant. And it was clear that he was going to start writing a warning ticket because he moved those items and he specifically testified that he removed the written warning out of it. You can hear paper shuffling when he's reviewing the licenses, reviewing the rental agreement in the video. So he is performing these tasks during that interim period. The fact that Fratzke shows up and then he calls in the criminal history check shortly after that isn't really relevant because he's already begun performing the tasks. So the one he did right away as soon as he got his new friend in the car was searching through these metal boxes for warning tickets. Well, he did it because he had some items in his seat, so he picked them up to move them to make room for the defendant to sit, and that's when he testified that he removed the warning at that time, which he would have had to do in any event to write the warning, so it wasn't like that process delayed anything. Mr. Atwood, when did he call for the dog? He never called for the dog, and I think that's one of the most important factors here when we talk about stalling for time. How can you try to impute that? As defense counsel has done in this argument, he said, let's call it like it is. He was stalling for time. How can he be stalling for time when he has no concept or clue if this officer is actually coming? Officer Fratzke could be on another call elsewhere. He's not made any contact with him calling him and saying, I've made a stop. It's apparent from the record that Fratzke overheard it on the radio and then went to provide backup. And so where the officer has not called for the dog, how can we say that he's unlawfully prolonging a stop for a dog that may or may not ever come? There's just no way to try to impute that onto the officer. Does that suggest that they're tag-teaming? I think the officers are working together in the interest of officer safety. They always back each other up if they're in the area and they're available, according to what the testimony was. Was Fratzke's testimony that he didn't see any basis for thinking that there was a drug problem? Yeah, that was his testimony. And Fratzke had, of course, just gotten there. He had really no knowledge at all about what the factual scenario was. He was just given a brief heads-up at the window by Trooper Tulin when he arrived. And then Fratzke went, spoke to the passenger in the vehicle, and then returned and ran the canine around. I think it was about seven minutes and eight seconds when the canine alerted. And the important thing to consider is the fact that this is an exceedingly short amount of time. Fratzke said it takes about five minutes to fill in a written warning. He says his average traffic stop, Tulin says his average traffic stop is about 12 to 14 minutes, which is a pretty reasonable amount of time. If you look at the written warning, there's something like 18 boxes that need to be checked or filled in with information, and the officers testified, we have to do this carefully and accurately. He even indicated that he'd started to write the wrong license number on one and had to scratch it out and start over. We can't race these officers through the missions of these stops because it's only going to lead them to put themselves at risk by trying to hurry through things too quickly or allow for confusion and problems later in the court when we've got wrong citations on or wrong statutes on citations. What is the legal effect of a warning? I don't believe a warning has any legal effect. So why is all this accuracy stuff so important? Because the interest of writing a citation in the first place is to get people to stop speeding because we're worried about the public safety on the roads. Why does that mean that all this has to be accurate in these 18 boxes? Well, it's just simply filling it out appropriately so it doesn't come back and cause problems with the court. I mean, that gets discussed. Explain that to me when it has no legal effect. It has the effect of warning individuals that if you drive this way, you could get a ticket. Well, that's the purpose of a warning. You could write it on a little index card, a three-by-five card. Don't speed anymore. Here, on your way. Right. Because there's no legal effect. As far as I'm aware, there's no legal effect. I'm just asking this generic question. Why are these 18 boxes there? It doesn't matter whether he's got the right name, the right license, the right driver's license. Well, it could be. All of the effect of giving a warning ticket is to warn the person not to proceed as they have proceeded in driving over the speed limit. Well, I think the courts don't consider it differently for purposes of this analysis. What the legal effect of a warning is isn't really what's at the heart of this matter. At the heart of this matter was a warning citation is essentially a citation like anything else, and a certain amount of time is required to complete that. If he's authorized to issue a warning, the nonsense of it all is not relevant. In a sense, yes. As far as the legal effect of a warning, it's just not relevant. It's because what we're worried about is duration and diligence, not the effect of a warning citation. It's just not an issue in this case. And I think one of the main points that you've all talked about is that there's not much possible way he could have been faster in proceeding through this stop. Traffic safety isn't anything to do with the stop either. In what way? It's interdiction. It's drug work that they're doing. And that's the point of Rodriguez is that traffic stops are supposed to be for safety on the highway and that you should only get involved with a drug dog or with a drug analysis if there's something that the officer learns after he makes the stop that gives him a suspicion that there's something to do with drugs. That's what Rodriguez is about. Respectfully, I think Rodriguez stands for the fact that, because that's a reasonable suspicion. If you've got that, you don't need a free air sniff. A free air sniff is lawful because it doesn't reveal the presence of anything anyone has a right to possess. You can run a free air sniff precisely because you don't have a reasonable suspicion or probable cause. What Rodriguez is saying in my reading of that case is, we'll allow you to do this, but you've got to be reasonable about it. That's the whole point of this diligence test. It's not saying every delay is unreasonable or unlawful. It has to be an unreasonable delay in order to be unlawful. And here, we just simply don't have it. It's not a case where we've got somebody waiting four or five minutes on the side of the road with nothing happening in between because the officers radioed another officer for a dog to come. Well, now, the traffic safety purpose of this stop was apparent by the fact that I assume you have objective evidence that the person was speeding. It wasn't disputed as far as the trial court was concerned. The officer testified that he was— You know that speed kills. It can. And so that's—I assume that's why we're stopping people for speeding. That was what the officer testified to, and there was no evidence he had any other indication whatsoever to have an alternative motive. But even if he did and ran the United States, that in and of itself, even if he had a hunch, that in and of itself doesn't render the stop unlawful. Pretextual stops are okay as long as you have other evidence. What is the purpose of the interdiction teams? The purpose of the drug interdiction teams? To reduce the amount of drugs trafficked through the roads of this state would be my guess. I've not read their website, but presumably that would be it. That's okay. It's two minutes. Well, essentially, I guess in sum, I would conclude that this was an exceedingly short stop. The officer was engaged in mission-related tasks as outlined by numerous Supreme Court cases. He did ask some questions that were drug interdiction-related, but that's okay under Mueller v. Mina and Arizona v. Johnson because those questions clearly did not measurably extend the stop. Because the whole time the stop's going on, we have to remember, the computer has not returned a result. So that defendant's here until that computer returns a result on those license and warrant checks and on the criminal history checks. And so because that, because the dog alerted before that happened, the stop should be upheld and the people would respectfully ask this court to affirm the conviction and sentence. I have a question tangentially related to this case. Sure. I'll try my best to answer it. Could Sanchez say, no, thank you, I'll stay in my car? I'd have to brief that. I don't know. I don't think that, I really don't know the answer to that question. I think the officer would be right to ask whether he could refuse it or not. I don't think he can lawfully refuse to follow the officer's request. Whether later on the officer had a sufficient reason for doing that would probably be the relevant issue. But I think, first and foremost, he should comply with the officer's instruction. Even if it's endangering him on a busy highway like Goddard AD? I think it would depend on the facts and circumstances. It's a difficult question and it's not one. We have all these signs for highway workers, slow down, felony status if you're a highway worker. It's admitted by the state, it's dangerous. Sure. I think the first thing is just don't speed. And then we don't have to worry, we don't even get to that point if you drive within the appropriate speed limit. But that could be disputed as to whether you were. So the fact that you have to endanger yourself upon the request of an officer seems extreme, doesn't it? Well, I think it's part of what happens when we drive on the roads. We don't have, you know, we have a reduced expectation of privacy on the roads. Well, this is not privacy, this is personal safety. I'm just asking. Right. I wish I had a better answer for you. Thank you. Mr. Boyd, is there a rebuttal? In brief response to your tangential question, I just want to say that I agree with you. Well, to your reply, I don't want you to waste your time. This will be extraordinarily brief. Mr. Rodriguez initially refused to get out of his car and the COOPER allowed him to do so in that case. For whatever it's worth. The first thing I'd like to point out here is the state's emphasis on the brevity of the stop. The state argues that the brevity of the stop is the most important factor. All due respect to the state, that's not correct. And I'm going to quote. I know Your Honors have read this. I just want to quote a pertinent line or two directly from Rodriguez. The reasonableness of a seizure depends on what the police, in fact, do. If an officer can complete traffic-based inquiries expeditiously, then that's the amount of time reasonably required to complete the stop's mission. Is brevity important? It is, but it's second. The most important question is what did the officer do? Now, let me just ask you one question. That is, is a dog sniff a search? Is a dog sniff a search? I don't think so. I don't think so. The state also argues that Fulen was doing, for lack of a technical term, ticket-related tasks during the entirety of the stop. And counsel argues that the record supports this. And I can see that reasonable people can view a video in different ways and read testimony in different ways. What I would point out is that, first of all, we got a factual finding from the trial court saying that the entirety of the ticket was most almost certainly written away from the scene at the Geneseo Police Department. And this court is required to give great deference to that finding. Second of all, on the video, we can see that Trooper Thulen didn't radio in until after Fraske arrived. Now, this business of what Trooper Thulen may or may not have been doing on the computer, I don't know. We can't see the front of that computer screen from the video, so we don't know exactly what it was that he was doing. But counsel's argument that, well, Jose somehow knew what Thulen was doing because he was watching from the back seat. Jose doesn't have the slightest idea what Trooper Thulen is doing when Trooper Thulen is tapping away at his computer. That's simply not supported by the record. So I would respectfully suggest that what the record shows here is that Trooper Thulen was not doing ticket-based inquiries throughout this stop. What he was doing was drug interdiction, and he did that until Trooper Fraske arrived. Well, you know, I mean, anecdotally, I can't hold a job, and so I used to be a cop, and I wrote a lot of traffic stops and never completed one in 7 1⁄2 or 8 or 9 minutes. Now, we didn't have warnings, but I've seen the state police warning tickets, and they look just like their citation tickets, except they say warning on them. So how is this guy going to get this stop done, even if he just writes a warning in 7 1⁄2 minutes? That's going to have to remain a theoretical question because Trooper Thulen wasn't doing ticket-based stuff during this stop. We don't know how long it would have taken him under this particular set of circumstances in this particular situation because he wasn't doing it. Well, the ticket-based stuff is more than pen to paper, isn't it? Yes, yes. And so it's gathering information. Now, you're saying, well, the dialogue here between the trooper and Sanchez was not related to slowdown or anything regarding speeding. Okay, you've said that. You know, that seems to be testified to. Okay, but it's the computer is used to get to ticket-based activity, isn't it, in a normal stop, such as running the license, doing this and that? Sure, it's one of those things, yes. And I understand that the state and I have a dispute as to whether or not Trooper Thulen actually was or was not utilizing his computer for that particular purpose. My view of the record, he wasn't. State's view of the record, he was. What did he say he was doing? What did he testify he was doing? As far as the computer? Or didn't your client testify that he was doing something with the computer? That he was doing something with the computer. And how he wasn't playing solitaire, I think. So what do you think he – So you just want us to assume that he was doing something unrelated to this stop on that computer? I don't want this Court to assume anything. I don't know what he was doing on a computer. I don't recall what his specific testimony was on that. Jose doesn't know what he's doing on a computer. I didn't see any of those – that computer screen during that video, so I don't know. I'm not asking this Court to assume anything. All I'm asking this Court to do is go ahead and – Because I haven't – I will concede I haven't seen this video for a very long time. Go ahead and take a look at the video, and the Court can draw its own conclusion. The State's made its case about what it thinks Schubert was doing. I've made my case. The Court can make its own factual determinations. But you've got this hurdle. You've got – respectfully, you've got this hurdle when the trial court made a factual determination that that ticket was not written, any part of it, on the scene. Counsel, there's one minute. The written part was not completed entirely on the scene. It was collected in the Geneseo Police Department. Yes. But we've – I think the opposing counsel is going to say writing pen to paper is just one step in completing a warning ticket, that there are preliminary things that must be done before you, you know, research, so to speak, in our world. And I would respectfully suggest that there's no reason in the world that – let's assume – and I am not conceding this. I will just assume this for the sake of argument here. Let's assume for the sake of argument that what Trooper Thulin did on his computer when he got in the car, if in fact he did anything – and again, I'm not conceding this for the sake of argument – that he was punching ticket-related stuff into his computer instead of buddying up with Jose and talking about where he was and what he was doing and where he was going and who his passenger was, hey, guess what? I can write the ticket. I can write the ticket instead of doing drug interdiction. I can follow Rodriguez and follow the law instead of doing drug interdiction. How about that, Trooper Thulin? That's my suggestion. Don't we want officers to be friendly? He could have written that ticket just as friendly as he could have buddied up to Jose. How about this? So I've watched the video. You want the trooper to walk up to the car and say, give me your license, sit right there, I'll be right back, and go back and write a ticket and walk back there and handle it. Now here, here's your ticket, now get out of here. That sounds great. Is that what you really think you'd like? You think that would really warm the cockles of the hearts of the public? Whether or not it warms anybody's cockles is frankly none of my concern. Whether or not it comports with the laws is my concern. All due respect, Your Honor, I respectfully ask this Court to reverse Jose's convictions for the reasons I brought back in my briefs. Thank you for your time, Your Honor. It's been a very interesting oral argument. I really do appreciate it. Thank you. Okay. Thank you, Mr. Boyd. Mr. Atwood, thank you, too. This matter will be taken under advisement. A written disposition will be issued.